Good morning. My name is Ben Micellis, M-E-I-S-E-L-A-S, and I represent the appellants Jane Mindy and Jason Sakamoto in this matter. I may have pleased the court on three issues to discuss the issue of the defective government tort claims that were found by the district court and then the court's granting of the summary judgment motion. I'd like to start with the interrelated. The motion for judgment on the pleadings took place after the court granted the motion to dismiss and kind of piggybacked off the same logic, although there was a slight difference there with the county. So I'd like to refer your honors to the record here to actually look at what this government tort claim looked like. I filled out a lot of government tort claims in my life and my career. I think the irony here is that this one was an exceptionally detailed one that admittedly did use some confusing language at the beginning, but was an eight page, very detailed tort claim. And so going to the excerpts of records, it is on exhibit document seven in volume three. What page? Just give us the page. The page is looking at the caption page. The caption page is listed Gerald Sakamoto by and through his surviving heirs. And each one of those surviving heirs is capitalized and listed in the caption page. And then it says victim. And it says victim. The singular. Victim singular. Although when we go to the next page, plaintiffs plural with each individual claimant underlined. And the reason, your honor, why you use that is in these government tort claims, there's generally one line for who the victim is. And so the idea here was he was the victim of the death, but it was brought by the claimants. And using the exact language that's used in California's wrongful death statute. Although in the claim you put Gerald Masao Sakamoto by and through brings. And actually when you quoted this claim at page three of your brief, the word you used in the quotations is bring, not brings. But the claim says brings, which suggests that the subject of the sentence is singular as opposed to the way you quoted it in your brief, which suggests that the subject is plural. Well, your honor, turning to the next page, which is 434, it corrects the, you know, unfortunate typo of the S and makes clear it's bring. On the top of page 434, it says plaintiffs plural bring this action to hold LASD accountable for this conduct to change and reform LASD procedures and protocols and ensure the enforcement. Again, using the statute of CCP 377.60, which says a cause of action for the death of a person, you know, can be brought by any of the following individuals in subsection A as surviving heirs. And so I was literally mirroring the language of the statute, but I certainly understand the confusion, but I hope that confusion could be resolved in the subsequent eight pages where the damages that are specifically discussed are wrongful death types of damages and not survival damages. And the way we know that, your honor, is page 439, where it says the injuries, the injuries is ongoing and through the present, a survivorship action, the injuries aren't ongoing. A survivorship action, if it was representative, would be up until the date of the death and not an ongoing. I'm sorry, you're citing page 439? 439, your honor. Where it says name and address of claimant, and you list the late Mr. Sakamoto by and through. Surviving heir, and then what I'm referring to now, your honor, was six, date and location of injury, ongoing and through the present, and then the damages listed, loss of consortium for the wife would have a loss of consortium claim, emotional injuries, conscious disregard for deceit and safety, and, yeah, I mean, repeatedly throughout its use plaintiffs. I can say that with respect to the county, and just shifting gears for a second, you know, the county understood from the fact that their rejection letters said decedent, and they've provided separate rejection letters for the individual clients that I represented with different claim numbers. We requested the district court take judicial notice of the fact that the county created different file numbers for Jane Sakamoto and for the daughter, and, your honor, that is in... I thought we had, I thought the California cases said, though, that it's not really, the purpose of this statute isn't so much to, you know, figure out whether the public entity, you know, could discern what, you know, you were intending subjectively to convey, but rather what, you know, what's contained in the four corners of the claim. Correct. I mean, I think the standard is substantial compliance. I mean, going to the cases that we cite, you know, which is the Stockett case, and the Stockett case says, it need not contain the specificity and detail in the pleading, but fairly to describe what the entity has to worry, where its purpose has been satisfied. I mean, I agree that by and through could have some level of confusion that was created. The county was not confused because they responded with individual rejection letters. For, remind me, just, I thought it wasn't for the full set of the plaintiffs that you represented. There was one plaintiff in there that was missing, but if we return to page 382 of the statute, you have claim presented date, your client. It doesn't say the estate. It doesn't say survivorship action. It says your client is Mindy Sakamoto Brink. That's what I intended by the by and through, and again, hit myself on the head a little bit that it was not as clear as it should have been, but they understood it. Well, they understood maybe that she was purporting to be one of the estate's representatives, not asserting a claim in her own right. Well, then it would have said your client. I mean, respectfully, I think it would say your client would be the estate of so and so. I mean, in the cases that were cited, I think it's the Nelson case. The issue was is that they didn't say the estate and then tried to bring the estate later on and come up with this other entity. My intention here was listing the names of individual claimants who had the right under CCP 37760 to bring it by and through, and so then they separately would have listed on page 384. They then list Jane Sakamoto as your client with the decedent being Gerald Sakamoto. The county didn't file the motion to dismiss at first. I mean, they smartly saw what the court did with the states and then filed the motion for judgment on the pleadings. I would have done the same thing if I were them, but the point being if you read through the eight claim, the plaintiff's plural is used. Yes, there was bring versus brings, but consistently it's stated in the plural and the damages are asserted in the plural. The damages, the loss of consortium damages, I think you're right that that could only be claimed by in a wrongful death action as opposed to a survival action, but I thought loss of consortium was limited to the spouse, not the children. Correct, and look, I could assure you that every government tort 910 claim filed after, you know, this one will not have the wife linked with the children, but specifically because there were three different claimants names. Was there a, forgive me for interrupting, was there a consortium claim in your complaint against the county? In the actual lawsuit that was filed? Pardon? The answer is yes, that was one of the claims that were brought. Can you point me where that is? The loss of a consortium claim would be a category of ultimately the damages that would be asserted, so when going to the complaint itself, which would be the actual complaint that was filed, starting on page 444. The damages that are listed, just for example, your honor, page 69, suffering for loss of comfort and society would be a rephrasing. That's in the context of your 1983 claim. Correct, and then in the context of what was asserted in the... I guess my question is, did you assert in your complaint against the county a state law loss of consortium claim? In the government tort claim, or in the lawsuit itself that was filed? In the complaint that you filed against the county. Yes, in the government tort claim it was filed, and then in the complaint itself it would be filed there as well through loss of comfort and society just being a way to refer to... I didn't see it in the complaint, but all right, I'll take another look. My question was maybe a different one than you understood. I guess I could see, relying on... You're relying on Nelson, how if you've at least mentioned a category of damages that's only consistent with someone bringing a claim in their own right, that that's enough perhaps to put the entity on notice that even though you inartfully phrased who the claimant was and all that, that they should have realized that actually there are two distinct claims. But that wouldn't seem to me to help the children here. I guess that's what I was trying to get at, that loss of consortium is uniquely claimed by the spouse and it's not a category of damages that uniquely applies to children. My response to that would be what would be only specific to the children are damages that were ongoing through the present because the survivorship would stop the date of death. And so that's why I read in context, conceded it was inartful, but it wasn't one of those things that you should say, the kids lose their lawsuits because the lawyer should have phrased it artfully, just candidly falling on the sword there. Moving to the broader issue here of the summary judgment, there's really one key thing where I think the court gets it overall wrong. And this is, it's in page six of the court's order. Let me refer you to the excerpt where that is. So the court's MSJ order starts on exhibit, the excerpt's page 10, but if you turn to page six of the very bottom. You said ER6? Sorry, ER. I'm sorry. The court's order page six, but it's ER15. It's where the court says, likewise, the fact that the entry neuroassessment problem did not trigger a further evaluation and that some necessary paperwork, necessary paperwork, was not completed, does not contradict the evidence in the record that decedent appeared completely able to care for himself. And so there the court is making a judgment that I think there is a triable issue of material triable issue of fact on. Here's what we know. We know that before he arrived at the inmate reception center. I'm sorry. Are you talking about ER15? I thought we were moving to the summary judgment order. This is not that. Oh, I apologize. I think we're moving to the summary judgment order and I have it on mine, Your Honor, as doc 92. I mean, all I have are the ER numbers, but okay, I'm sorry. I just. And I apologize. Just say again. I was trying to find what you're talking about. Just repeat what you were just trying to say. So the paragraph that I think sums up the whole argument with the summary judgment reads this way. It says, likewise, the fact that the entry neuroassessment problem did not trigger further evaluation and that some necessary paperwork was not completed, does not contradict the evidence in the record that decedent appeared completely able to care for himself. And then you were going to talk about the facts. I was going to talk about the facts that were in the record. Once you go ahead and do that. The facts in the record here are the two CHP officers who saw him. One said it looked like he was my grandfather who had Alzheimer's. But we're talking about the county's liability. Correct. And I'm just saying based on. They never learned. That's part of the problem. They never learned the information from the CHP folks, right? Right. And what the court seems to blanket them here with, though, is the fact that the necessary paperwork for conducting that valuation was never done somehow immunizes them when that evaluation would have led to those very specific findings of his condition. When we did the deposition of. It was Jung. I mean, Jung specifically said that if one of these boxes were checked, it was a mandatory obligation that another evaluation was done. And that evaluation was not done in this specific case. Further where you checked that box. And I'm just I'm sort of lost because I don't understand how you get. What is it that you think put the county, not the state, the county on notice that he had issues that needed further investigation? So very specifically, if you go to the form, the assessment form that the inmates fill out, you know, and. This is. I'm just looking where the exhibit excerpts are. We just refer to the form and we'll waste your honor's time. The arrestee medical screening form that's filled out where the county gets this document when the CHP brings them there. And that determines. Yeah. And that's what I'm saying. You have fault on the state's part that's separate from the county. If you're talking about the county, I think you need to just forget about whatever the CHP did wrong. Right? Right. OK. So what did the count? What do you think gave the county independent notice that there were issues with? Question five. Does the arrestee appear to be under the influence of alcohol and or drugs? If yes, have jailer begin intoxication observation sheet. If arrestee appears to be under the influence of alcohol or drugs, the observation sheet shall be completed. And that is checked. Yes. And no observation sheet was ever completed in the first place. Then there's negligence, maybe then much more than that for your underlying constitutional claim. Correct. But then when Nurse Lindo did her observation, she wrote neurological problem. She says no. She says it was a mistake. Yeah. She says it was a mistake. And so we have to believe that she's accurate. That it was a mistake that when she wrote neurological problem, that that was actually a mistake. And she meant to write no neurological problem for someone who we know has a neurological problem. So we would have to. They don't know that. That's the problem. The county doesn't know that. Totally accurate. But what we do know is, is they checked the box that based on, had they checked that box, based on the deposition of Jung, neurological problem would mean mandatory clinic. You would have to transfer. But counsel, even if I were to grant you that looking at the evidence in the light most favorable to the non-moving party, we shouldn't credit the deposition testimony and we should credit the form. How does that get to a 1983 violation? How does that get to a practice or policy of basically deliberate indifference and actual deliberate indifference? Because releasing someone when there's a mandatory obligation to refer them to the clinic, not making that mandatory referral, would be just like the cases we cite where the police take custody of someone and put them out in the freezing cold, or they take the female and put her in the danger. No, I think Judge Bennett's question is, what's the policy that you say? Not just that, you know, there may have been mistakes made here. There may be contradictions. That's not enough to get you under Monell a 1983 claim. You have to show that there is a practice or policy. And where do you show that? And I think there's two issues there. On the one hand, there's the state created danger issue and the special relationship issue. And then there is separately a Monell issue. On the Monell issue, the policy is their policy. I mean, we know what the policy was and we know the policy wasn't filed by looking at the deposition of Jung. Jung didn't even know this policy existed when confronted with the policy. But Jung also said that there was a mandatory obligation to refer the individual to the clinic if neuro problem existed. I get that she said it was a mistake. But again, even if we take the facts in the light most favorable to you, which is she she saw a neurological problem and mistakenly didn't refer Mr. Sakamoto. How is that more than mere negligence? How does that rise to the level of a 1983 violation? Based on the cases we cited, which on the special relationship, the most significant case was the Wayne versus Reno case, where this involves someone in custody who was then released into a dangerous situation. And then based on the other dangerous conditions, state created danger cases we cited by putting a mentally ill bipolar person with no money into the street, that was that created the omission necessary for the due process clause analysis under a section 1983 claim. Why don't we ask you to pause? You've gone way over your time, but we'll give you a couple of minutes for rebuttal. Let's hear from counsel for the defendants. And I understand you. You all are going to split your time. Who's going first? I hope you don't feel like that's what happens when you come to our court, victimize my goodness. Good morning, your honors. May it please the court, David Adida of the California Department of Justice on behalf of the state of California by and through the California Highway Patrol. So the issue here, as we all know, was a tort claim filed by the appellants on their own behalf, not on behalf of Mr. Sakamoto. Let's look, as counsel said, let's look at, I grew up in New York where we say let's look at the videotape, but let's look at the record. The claim itself. We've seen it. I mean, so I guess I have one question for you. Maybe I can just cut to the chase, at least in my own mind. The specification of loss of consortium damages, it seems to me, would be enough. It's dicta in Nelson, but there is a suggestion there that at least if the person had alleged a category of damages that's exclusive to a particular type of claim that maybe they haven't crossed all the T's and dotted all the I's, that's enough to put you all on notice that they're not just seeking to recover on behalf of the estate. And so why wouldn't we at the very least reverse as to the claim that brought by Mrs. Sakamoto? Your Honor, we're looking at three words in a sea of representations and the claim itself, claimant, Mr. Sakamoto, that's it. Nobody else. Sure. At the end in the remedies, it says loss of consortium. I've been an attorney for about 28 years now, and loss of consortium is one of the most misunderstood claims, if I may, in California. Everybody thinks that they can assert one as long as they're not allowed to perform sexual relations with their partner. They believe they have a loss of consortium claim. So here in the claim, you have all of the damages, all of them except for one concern the estate, and then you've got this loss of consortium. Again, this is not a model of clarity, and we're trying to make sense of something that if we look at the whole picture, a lot of things does not make sense. I don't have the answer as to why it did not ring a bell. But if you look at the whole claim, it should not have rang a bell because it's clear from the whole claim that the claimant is Mr. Sakamoto. Whether or not he believed he was entitled to- I'm saying the burden wasn't on you. The burden was on them to make this clear. They made it hopelessly, at best, hopelessly unclear, although in your view, they made it much more clear that it was only a claim for the estate and not otherwise. And that even if they threw in one or two words or three words here or there that would be consistent with an individual claim, that was not, quote, substantial compliance under the law. Thank you. I think I can just sit down now. That was a softball question. I can see it. At the end of the day, the substantial compliance doctrine only comes into play to remedy mistakes as to form, not substance. And God knows the name of the claimant is substantive. If you look at the requirement of the Tort Claims Act, number one, name of the claimant. Number two, where did this happen? Number three, what are your damages? We don't have that here. And so, oh, and Your Honor, with respect to the loss of consumption claim, that is a separate claim that was not asserted in the complaint against either the state or the county. And so. I don't think that matters. For purpose of the argument, we're entertaining here, though. The question is whether this claim gave you enough notice that they were not, at least to Mrs. Sakamoto, she was not just asserting a claim on behalf of the estate in a survivor action, but rather was also asserting damages on her own behalf in a wrongful death action. With all due respect, Your Honor, I understand the point that, yes, it is loss of consumption can only be gotten by the spouse, not even the children. Why when you see that, why doesn't that say, oh, well, whatever misconception we might have been under, given like who the specified claimant, the references to plaintiff's boy, does that mean they're, whatever uncertainty you had, by the time you get to the damages, why doesn't the assertion of, we are seeking loss of consortium damages on behalf of at least one of these people, why doesn't that tell you, oh, it's not just a survivor action? Because we know those damages cannot be recovered in a survivor action. Again, you don't look at those three words in a vacuum. You look at the entirety of the document. Now, these documents are, Mr. Maesalas admitted to having written, you know, a ton of them, but most of the time, you know, it's people, sometimes lay people who write these claims. So it's normal that there are mistakes made in the articulation of what the damages or the claims or everything. So if you just see, you know, loss of consortium, it's not going to jump at you and say, hey, you know what? Let's forget about everything that I've read in these eight pages. I think they're trying to assert a wrongful death claim. Look at the whole, the words wrongful death is not mentioned once in the entire claim. So, and so what the standard, what the plaintiff, the appellant wants the standard to be is, you know, let's forget about the written words. Let's forget about the four corner of the document. But let's instead look behind the words and the stated intentions. I'm just looking at what the court in Nelson said. It seems to me that's one of the most on point cases we have. And what the court there seemed to find significant was, I think there, maybe it was the reverse of what we have here. I can't remember exactly, but the court said, and part of the reason why it said we're not going to allow this new sort of new claim to be brought in is because the damages described in the claim were for the loss of a son with no mention of any damages incurred by Duane before his death. And I guess I read that language as suggesting that if, notwithstanding all of the other problems with the claim there, they had specified damages that were uniquely available in the action that they now wanted to bring, that the result might have been different. I promise this will be my last point. And, but I want to mention something that's important here. The court, if you look at the decision in Nelson, the claim itself did not just say loss of a son. If you look at the footnotes, it says loss of a son, economic losses, emotional and mental injuries. Now if the attorney had been, you know, an artful advocate, he would have said, hey, you know what? The economic losses and the emotional and mental injuries could also have been asserted on behalf of the estate. And therefore, I gave notice to the state by mentioning these two remedies that we were also asserted in claim of the estate. But that's not what the court did. The court focused on loss of a son because that was the main damage. The other stuff flowed from the loss, you know, or at least was relevant to the loss of the son. And same here, you've got six different damages. Five of them only pertain to the estate, and you've got that one lost in the middle that pertains to the wrongful claim. And so... I hear you. Okay. Well, why don't we let, hear from your co-counsel. Absolutely. Thank you very much. Appreciate the argument. Good morning, your honors, and may it please the court. My name is Emily Serr, and I represent the County of Los Angeles in this matter. As we've discussed, there are two issues relating to the county before the court. One is whether, through their policies, customs, and practices, they violated plaintiff's 14th Amendment rights. And the other is in regard to the Claim Act. As Ms. Rodita has already argued in much of the Claim Act, I would like to just limit my comments on that unless the court has additional. What I would like to cover is the letters that were sent by the county. As was pointed out by the appellants, the letters were addressed to the clients, which whether they're in a representative capacity or individual, they are still clients. So those letters were not sent to claimants, which would be a different identifying them. That there were separate letters does not suggest that they conceded that each of them were a plaintiff in their individual capacity. And I think the Castaneda case is right on point with this one in that, in that case, they allege the same argument. Hey, counsel, I have an unrelated question. So in the private investigator interview with the inmate operator, Ms. Rodel, she said that Mr. Sakamoto's widow told her that Mr. Sakamoto had Alzheimer's or dementia and that she did not pass that on. I think she testified, she did not, or not testified, she said in this interview she didn't pass that on. And that there was no policy, I think, that you've pointed to requiring that that be passed on. Am I, do I have those facts right? Well, those facts are unsupported by the record, your honor. You do have it correct that, I apologize. No, no, no, you go ahead. You are correct in that that is what the investigator's report says. However, it contradicts what Ms. Rodel ultimately said in her deposition. Well, I read Ms. Rodel's deposition, but the transcript of what the investigator says is that Ms. Rodel said that the widow said he has Alzheimer's or dementia. Did you ever, in the district court, object that that's merely hearsay? Your honor, I can't remember off the top of my head. I would imagine it was. However, our main argument is that it's irrelevant what Ms. Rodel thought the call said or what Mrs. Sakamoto thought the call said because we have the actual phone call. Although, Ms. Sakamoto said she doesn't think everything is in those transcripts, right? Mrs. Sakamoto has no credible evidence to challenge the transcripts. Well, didn't she say, I don't think it has everything? She said that she doesn't believe it does, but she was not able to produce any evidence to demonstrate that there was an additional phone call. No, but why wouldn't, I don't believe that's enough. Why isn't that enough on summary judgment? I mean, again, that doesn't establish what else was in there, but if it's admissible, we have Ms. Rodel saying to the private investigator, she said he's not drunk. She said he has Alzheimer's or dementia, and I was like, oh, okay. Ms. Rodel, again, under oath, said that that wasn't the case, that when she put it on hold it was to check the citation. Additionally, like in Scott v. Harris with the video, we have an audio file that's undisputed. We have phone records that show that there are no additional phone calls that were made. There's nothing to dispute that that is a valid recording of what happened, a valid recording of that conversation. Well, I mean, if Ms. Rodel had said this in her deposition, it wouldn't matter for summary judgment purposes how many transcripts you had. It doesn't matter if you have 100 people who say the light was red, if you have one person who said the light is green. But, I mean, so I'd like to know why, in your view, what your argument was to the district court as to why this wasn't evidence that the county was on notice that Mr. Sakamoto suffered from Alzheimer's or dementia. Again, I would return to Scott v. Harris. If five people say the light is green, one person says it's red, but there's video footage showing that it's green, then we can't, then the court shouldn't listen to the one person who says that it's red. I agree in that instance, but here we have somebody who is a participant to the conversation, and we have the other person who's a participant who says, I can't tell you exactly what else was said, but I don't think this was everything. I mean, this is summary judgment. I mean, I think that would be way different if it were a trier of fact, but this is summary judgment. I understand, Your Honor, but pure speculation is not enough to overcome summary judgment, and it does not create a triable fact when there's not a genuine dispute. They have not put forth any evidence to demonstrate that the audio file that was submitted, not just the transcripts, are inaccurate or that they're missing something. Again, we have all the phone records. If there was another phone call or if the phone call was longer than the recording, which it's not, we have the timestamp so we know exactly how long the call took, and that aligns with the audio recording. So there just isn't any competent evidence to challenge what is just clear evidence as opposed to somebody's fallible memory. When Riddell's, I think the words were, I believe his wife said such and such, so it wasn't an assertion that I know that was said or I remember that was said. But my question is, when that testimony was given, had Riddell listened to the tape recordings or not, or don't we know? Your Honor, I see my time is running, may I? No, we'll let you go over. So I'd just like to clarify the question. Are you talking about during the deposition, was she listened to the, was she provided the audio or during the interview with the private investigator? I'm sorry, you're right to make that, let's, the answer is both. For the private investigator, I'm not sure. I would, I wasn't part of that and I don't believe that it's in the transcripts whether he showed it or played it for her. In the deposition, we did play it for her, and while she initially had some similar confusion where she said, I thought this was, I thought, once she listened to it, she says, you're right, that is what happened. And when I put her on hold, it was to check a citation, not to ask about Alzheimer's, which, by the way, in her deposition, she mentions that too, and she initially got confused and thought maybe she had brought it up to the supervisor. Well, I mean, but again, in the interview, she specifically said, referring to Ms. Sakamoto, she said that he wasn't drunk, that he had Alzheimer's, is the, is at least the quote from the transcript. Yes, Your Honor. But again, as you did point out, this is hearsay, and I will go back and double check that we raised that objection. No, that's all right. I mean, I think it clearly is hearsay, but I don't know that that was made, that that objection was made to the district court. I can go back and check our records, and I can submit a supplemental brief if you would like, or I could probably find it right now, but I don't want to take up some time. Yeah, we don't need a supplemental brief. We can figure it out. So, I'm not sure how the time is working now. I think I might have two minutes. What happened was I think your co-counsel took up more time than maybe was allotted to him, so I'm happy to give you a couple of minutes. You should say what you wanted to say. I would just like to just briefly address some of the other motion for summary judgment issues that were brought up by the appellants. So, the first is the arrestee medical form. A lot of effort was spent on that, that the jailer should have done this, and if the jailer had filled out this observation sheet, it would have triggered a second evaluation at the IRC clinic. So, this argument fails on multiple levels. First, Mr. Sakamoto, because he was over the age of 55, automatically received enhanced screening. That's why he was sent to the IRC clinic. That's why he received a second evaluation by Nurse Lindo. So, whatever would have happened, it happened anyways. Second, both Nurse Zhang and Nurse Lindo testified, or, well, one did a declaration, one testified that they did check Mr. Sakamoto for intoxication. They checked him for tremors. They assessed him visually, and both found that he did not appear intoxicated, which is completely in line with the video, which shows that he is steady on his feet. He's alert. So, this is like, what, eight or 10 hours after he was arrested? No, Your Honor. He was arrested around 3.30 in the morning, and he was booked into IRC at 7.25 a.m. When was he released? He was released at, he walked out the door at 7.47 p.m. So, it's four hours, I'm sorry. Yes, so, at the time when he's there, he doesn't appear intoxicated. The video evidence supports that he didn't look intoxicated, and both nurses did a visual assessment, checked for tremors, checked for regular bloodshot eyes, any different, any slurring, and found that none of that was present. So, that's a red herring. There's nothing that would suggest that had the jailer filled out this form, something different would have happened. And, as explained in the declaration of Deputy Ferroli, at IRC, they don't follow that. Because they have nurses on staff 24-7, a nurse checks for intoxication rather than a jailer. It just makes more sense. As to the neurological problem,  that we were supposed to be looking, from the papers, it would be bipolar disorder. Mr. Sakamoto told Officer Sanchez of CHP that he had bipolar, although that was not communicated to the department. What they seem to be saying is that if he had reported that he had bipolar, this would have changed the outcome somehow. However, the fact that someone has bipolar does not render them incapable of caring for themselves, and therefore doesn't make an unreasonable, dangerous situation by releasing them. We have video footage from 7.25 a.m. to 7.47 p.m. showing Mr. Sakamoto was perfectly ordinary, as the district court categorized it. He helps himself to food, he navigates a confusing area with no trouble, he follows directions. There's nothing to suggest that even if he was bipolar, he was going through some sort of manic episode or something else that would render him helpless once he got out. Moreover, Nurse Lindo did a full neuroassessment, which is fully documented. In there, it says that he reported having no neurological symptoms at that time, which again would mean there's nothing to keep him there just because he happens to have a disorder that many people walking around have. Did I set everything there? I think those were the main points that he made, but I would just like to make one or two little ones before I let you guys, one before I go, is that the facts of this case aren't really in dispute. Because we have video footage showing him at every step of the way, because we have medical records that we know cannot be altered, because we have audio of all the phone calls  there's just no question in the record that he was a very, very normal person. That there was nothing to put the county on notice that Mr. Sakamoto was suffering from any ailment that would render him unable to care for himself when he was released. Okay, thank you, Counsel. Thank you, Your Honor. Let's put two minutes on the clock. Rebuttal. Thank you. Two very quick points. Mr. Adida stated that there was no reference in the 910 claim to a wrongful death or accusing them of the death. And I would just refer the court to the section about the California Highway Patrol, which specifically says, the California Highway Patrol, and name some other entities, are partially responsible for the death of Gerald Sakamoto. And then the other injuries, emotional injuries, can't be asserted in survivorship actions. You don't have emotional distress survivorship claims. So there was a reference that there were all these categories of damages and only loss of consortium. In fact, all of the categories of damages aren't estate related damages. The survivorship claim would have been perhaps for burial expenses and funeral expenses and other loss of out-of-pocket expenses that predate the death. None of those are actually listed. The damages that are listed are actually all the types of damages you would list in a wrongful death. And there's no reference to the estate actually anywhere. So it's a reverse of Nelson where the issue of the estate was referenced, but the other claims weren't referenced. Regarding the video footage, which I think is a red herring. I'm not sure if someone who has bipolar is supposed to act crazy on a video to prove that they have the disorder. The issue was, was there a reporting or not a reporting of it? There was- How do you respond to counsel's assertion that even if that box had been checked, nothing would have been done differently because he got the two evaluations? Well, as I understood it, if you had the neurological problem and that was checked- No, you're talking about the jailer form that you stressed. Correct. But that would have, in my view, have triggered not the Lindo, not the Lindo, but a separate hold that would have been required and the jailer observation would have been filled out. I mean, we're told that these medical records are unalterable and we should view the sanctity of these records as the be all end all, but they're not filled out. And so they're empty. Okay. Thank you very much, counsel. Case just argued as submitted.
judges: Watford, Rakoff, Bennett